In re Larry Fred CAWTHORN, June Eva Wright Cawthorn, Debtors.

COSTNER'S FURNITURE, INC., Plaintiff,

v.

Larry Fred CAWTHORN, June Eva Wright Cawthorn, and Melba C. Pirkey, Trustee, Defendants.

Bankruptcy Nos. 79–00560, 79–00561.

United States Bankruptcy Court, W. D. Virginia.

Oct. 30, 1979.

Joseph P. Bounds and Tommy Joe Williams, Roanoke, Va., for plaintiff.

F. Rodney Fitzpatrick, Roanoke, Va., for defendants.

## MEMORANDUM OPINION AND ORDER

H. CLYDE PEARSON, Bankruptcy Judge.

Larry Fred Cawthorn and June Eva Wright Cawthorn (Debtors), on July 6, 1979, filed in this Court their petition seeking confirmation of a plan of payment of their creditors pursuant to Chapter XIII of the *Bankruptcy Act.* Thereupon, pursuant to *Rule* 13–401, an automatic stay was invoked as to the commencement or continuation of any action against the Debtors, or the enforcement of any judgment against them, or of any act or the commencement or continuation of any Court proceeding to enforce any lien against their property.[1]

Among the creditors of the Debtors was an alleged secured creditor, Costner's Furniture, Inc. (Plaintiff herein). On August 1, 1979, the Plaintiff filed this Complaint seeking relief from the stay of *Rule* 13–401 to enable Plaintiff to repossess and liquidate its collateral consisting of a large quantity of furniture sold to the Debtors.

Prior to the filing of the Complaint, the Plaintiff and the Debtors had litigated in the Circuit Court of Botetourt County an action seeking the recovery of said furniture. The case in Botetourt County had progressed to a point where the Circuit Court Judge had announced a decision from the bench that the Plaintiff had a valid security agreement in the furniture, and was entitled to judgment in the sum of TWENTY–TWO THOUSAND and 00/100 ($22,000.00) DOLLARS; however, before the formal order was entered, the petition by the Debtors was filed in this Court thereupon staying any further proceedings in Botetourt County.

---

1. Rule 13–401. *Petition as Automatic Stay of Actions Against Debtor And Of Lien Enforcement*

(a) *Stay of Actions and Lien Enforcement.* "A petition filed under Rule 13–103 or Rule 13–104 shall operate as a stay of the commencement or continuation of any action against the debtor, or the enforcement of any judgment against him, or of any act or the commencement or continuation of any court proceeding to enforce any lien against his property, or of any court proceeding for the purpose of rehabilitation of the debtor or the liquidation of his estate." (b) *Duration of Stay.* "Except as it may be terminated, annulled, modified, or conditioned by the bankruptcy court under subdivision (c), (d), (e) or (f) of this rule, the stay shall continue until the case is closed, dismissed, or converted to bankruptcy or the property subject to the lien is, with the approval of the court, abandoned or transferred."

The Plaintiff asserted a defense of *Res adjudicata* in this Complaint contending that the determination by the Circuit Court of Botetourt County was a final adjudication of the rights between the parties as to the matters involved. This Court took under advisement the claim of *Res adjudicata* and proceeded with hearing of the evidence in the case.

The facts developed at the trial are not substantially in dispute except in some minor respects.

This Chapter XIII Debtor proceeding is one of several cases in this Court which are "fall outs" from the demise of a celebrated case filed in this Court originally under Chapter XI and subsequently converted to liquidation entitled I.M. & E., Inc., d/b/a International Marketing & Engineering, Inc. (IME).

In June, 1976, Larry Fred Cawthorn, one of the Debtors, was employed in an executive position as a marketing consultant with IME; bought a house in Botetourt County; moved his family to Roanoke and commenced work with IME. The Debtor testified that his salary with IME from March until November, 1978, a period of eight months, was approximately THIRTY–NINE THOUSAND and 00/100 ($39,000.00) DOLLARS, and this was the inducement for the Debtor to move his family from West Virginia to Roanoke and accept the position. (The Debtor is now employed as a Clerk at a Hop-In Convenience Store.)

The evidence further showed that before the purchase of the house in Botetourt County was closed and before the family moved from West Virginia, Willie George Costner, Manager of Costner's Furniture, Inc. in Shelby, North Carolina, who was also an interested party and possible Officer in IME, approached the Debtor about furniture for the home. Willie Costner is also Father of Dennis Costner, President and Chief Executive Officer of IME, and Vice-President of Costner's Furniture, Inc.

The Debtor visited the new house in Botetourt County with Becky Costner, an interior decorator and Wife of Dennis Costner, concerning the possible purchase of some furniture for the new residence. Prior thereto, the Debtor had visited other homes of IME employees which had been redecorated by Becky Costner and refurnished by Costner Furniture, Inc. The Debtor testified that during this time he discussed with Willie Costner the purchase of furniture in the range of EIGHT to TEN THOUSAND DOLLARS, and that Becky Costner gave a suggested estimate of furniture needs of TWELVE to FOURTEEN THOUSAND DOLLARS. The Debtor further testified that afterwards, when he and his family came to Roanoke and visited their new home in Botetourt County, the house was completely furnished in every room with new carpets, drapes, and ready for occupancy. The invoice for which as of June 9, 1978, totaled TWENTY–FOUR THOUSAND DOLLARS ($24,000.00). The Debtor further testified that his Wife had planned to move certain items of furniture from West Virginia, including a dining room suite and that with these items the complete furnishing of the house was not intended nor necessary.

The evidence was conflicting as to the manner in which the purchase was made. Willie Costner testified that the furniture was sold to the Defendants, who contracted the services of his daughter-in-law to decorate the home; that the furniture was delivered in June, 1978, by the Plaintiff's trucks; that the original arrangement was a "cash deal" with ONE THOUSAND DOLLARS and 00/100 ($1,000.00) down payment and the balance becoming due when the Debtors sold their home in West Virginia. Accordingly, only a ledger card and invoices were executed in connection with the transaction.

The Debtor testified that the purchase was to range in the aforesaid EIGHT to TEN THOUSAND DOLLARS: that it was a credit transaction in which the Plaintiff was to arrange financing for the purchase on an agreeable basis; that in as much as the Debtor resided in Virginia, and the Plaintiff's financing sources were located in North Carolina, the financing was not consummated as planned and as a result of

which, on November 6, 1978, Dennis Costner brought to the Debtor in the IME headquarters office in Roanoke, a security agreement to be signed in an effort to create a security interest in the purchases. The security agreement was signed by the Debtors, and the evidence further shows that on March 16, 1979, the security agreements were filed in the Clerk's Office of the Circuit Court of Botetourt County in an effort to perfect a security interest in said collateral in behalf of the Plaintiff.

The security agreement introduced as "Exhibit 1" herein and made an appendix to this Memorandum reflects a principal amount of TWENTY–TWO THOUSAND SIX HUNDRED SIXTEEN and 00/100 DOLLARS ($22,616.00), with a down payment of TWELVE HUNDRED AND 00/100 DOLLARS ($1,200.00) with the addition of finance charges of FOUR THOUSAND TWO HUNDRED FORTY–ONE AND 92/100 DOLLARS ($4,241.92), made a total deferred payment of TWENTY–SIX THOUSAND EIGHT HUNDRED FIFTY–SEVEN and 92/100 DOLLARS ($26,857.92). The security agreement further provided twenty-four equal payments of ONE THOUSAND SIXTY–NINE and 08/100 DOLLARS ($1,069.08) per month with the first payment becoming due December 6, 1978. In addition, the contract contained other standard provisions of a security agreement.

Plaintiff also introduced a copy of its ledger card reflecting payments upon the purchase on August 14, 1978, of TWO HUNDRED and 00/100 DOLLARS ($200.00), October 27, 1978, of ONE THOUSAND and 00/100 DOLLARS ($1,000.00), November 29, 1978, of ONE THOUSAND FOUR HUNDRED SIXTY and 00/100 DOLLARS ($1,460.00), December 16, 1978, ONE THOUSAND SIXTY–NINE and 00/100 DOLLARS ($1,069.00), in addition to the down payment of TWELVE HUNDRED and 00/100 DOLLARS ($1,200.00), all of which payments totaled FOUR THOUSAND NINE HUNDRED TWENTY–NINE and 00/100 DOLLARS ($4,929.00).

Additionally, Plaintiff introduced "Exhibit 3", being a letter dated September 12, 1978, from Becky Costner to the Debtors setting forth a list of the items purchased. This list included, in addition to the major furnishings for each room, numerous accessories such as pictures, figurines, ash trays, flowers, bookends, as well as a set of china.

The evidence further showed that when the security agreement dated November 6, 1978, was presented, it was brought to the Debtor by Dennis Costner, Chief executive officer of IME, in the corporate executive offices located in the First National Exchange Bank Building in Roanoke where the Debtor's Office was a part thereof. The Debtor testified that at the time the security agreement was presented to him, he was apprehensive about losing his job with IME because some other executives with the Company were in the process of being relieved of their duties; that it had been rumored in the office of IME that the Debtor would have to resign or be fired, and shortly thereafter on November 28, 1978, the Debtor did, in fact, resign his position and terminate his employment with IME.

IME had apparently been exceedingly successful since its inception to a point when its product came under heavy publicity concerning the ineffectiveness of its product in the field of energy saving devices. This ultimately resulted in its demise and petitions herein under Chapter XI.

The Debtor testified that at the time he and his Wife found the furniture installed in the house, and at the time the security agreement was executed, his salary and income would accommodate, without question, the ONE THOUSAND and 00/100 DOLLARS ($1,000.00) monthly payment upon the contract. The Debtor further testified that when discussing the purchase of the furniture with Willie Costner, President of Costner's Furniture, Inc. in the price range of EIGHT to TEN THOUSAND DOLLARS, that he discussed financing of one or two rooms of furniture; that any other additional furniture for the remainder of the house would be furnished following

consultation with his Wife; that a dining room suite they had previously purchased and other personal items were being brought from West Virginia for use in their new home including their refrigerator; that when the Debtor and his Wife arrived at the house in Botetourt County "we were both stunned to find the house totally furnished"; that at that time, he had no knowledge of the cost of the furnishings except what he had previously discussed with Willie Costner in the range of EIGHT to TEN THOUSAND DOLLARS.

The Debtor further testified that no security agreement had ever been signed prior to November 6, 1978, for the reason that financing was to be arranged by Costner's Furniture, Inc., and therefore, no need existed for such contract. This evidence conflicted with the evidence of Willie Costner that the original purchase was to have been for cash payable from proceeds of the sale of the Debtors' home in West Virginia; however, the Debtor further testified that he had no expectation of realizing more than FIVE THOUSAND and 00/100 DOLLARS ($5,000.00) equity from the sale of his home in West Virginia.

The Debtors both testified that there were certain damaged items, some of which were repaired to some extent by Willie Costner by the use of glue, and some damage remained.

When the security agreement was executed on November 6, 1978, the Debtor testified that it was brought to him by Dennis Costner for signatures, even though all prior dealings concerning the furniture had been with Willie Costner; that at the time Dennis Costner was for all intents and purposes, his employer and the Debtor neither read nor questioned either the execution of nor the terms contained in the security agreement.

The evidence showed that the retail mark-up on furniture of Plaintiff ranged as high as 100% or more, but that most of the furniture involved in this transaction carried possibly a smaller mark-up due to discount granted. Indeed, the list of items tendered on "Exhibit 3" totaled TWENTY-NINE THOUSAND TWO HUNDRED SEVENTY-NINE and 50/100 DOLLARS ($29,279.50), which apparently was the retail list price of the items sold.

### Res Adjudicata

The parties have raised several issues of law with reference to this Complaint. The Plaintiff first asserts the issue of *Res adjudicata* due to the proceedings in Botetourt County. The Plaintiff contends that the State Court action in Botetourt County where the Judge announced his decision, was an adjudication of the rights of the parties hereto, and therefore, this Court should not further inquire into the matter which has been adjudicated with finality in that proceeding.

Rule 1:1 of *The Rules of Procedure of the Supreme Court of Virginia* provides that appeals may be taken after the "entry" of a final order. All procedure relating to orders of the Circuit Courts of Virginia relate to the date of "entry" of the final order appealed from. See *Rule 5:24*. Indeed, there is nothing in the *Rules* that would prohibit the Judge who has announced a decision from the bench from modifying or otherwise changing such opinion so announced after due reflection since a final order had not been "entered". Within the purview of the *Virginia Statutes* and *Rules*, the finality of an adjudication is the order, decree or judgment "entered" of record and it is that order, decree or judgment which can be made the subject of an appeal, and therefore, has binding effect as a final adjudication upon the merits.

Plaintiff, prior to the trial of the Complaint herein, in fact, expressed a desire to have such an entry of a judgment in the Circuit Court of Botetourt County *Nunc Pro Tunc* presumably in order that such judgment may be "entered" as provided by the *Rules*. Upon objections by the Defendant with reference to the stay invoked upon the filing of the Debtor petition herein, pursuant to *Rule 13–401, Supra* ; this Court heard the Plaintiff's motion and objections by the Defendant, and accordingly, entered

an order herein on September 27, 1979, holding that *Rule* 13–401 stayed any further proceedings in the Botetourt County action immediately upon the filing of the petition herein, and, therefore, all matters should be heard and considered in light of the posture of the case at the time the petition was filed as governed by the *Bankruptcy Rules* and *Bankruptcy Act.*

The issue as to whether or not proceedings in State or Federal Courts involving similar issues raised in the Bankruptcy Court are *Res adjudicata*, have been heard and determined in numerous cases. Assuming arguendo, that the announced decision of the Circuit Court of Botetourt County was a final adjudication of the issue between the parties it is not necessarily the same issue before this Court. In the Circuit Court of Botetourt County, which was a Law action, the issue was simply whether or not upon the detinue proceeding the security interest existed and the right to recover the property as a matter of law should be granted. No equitable relief was sought as to the nature of the agreement nor its effect when viewed from the rights fixed by the *Bankruptcy Act* and *Rules.* We have here a question as to what extent a Court of equity may determine a claim asserted by a creditor, its recognition and its priority as to other creditors under the *Act.* Bankruptcy Courts have held on numerous occasions, that a determination in another Court may be inquired into and the Bankruptcy Court may go behind such a determination in an effort to do equity as between the parties. See *U. S. v. Harrington* (4th Cir.) 269 F.2d 719; *Boynton v. Ball*, 121 U.S. 457, 7 S.Ct. 981, 30 L.Ed. 985; *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281. See also the numerous authorities on this point collected in the case of Re: *Russo*, 1 B.C.D. 538.

■ Accordingly, whether the finality of the State Court proceeding is governed by *Rule* 1:1, *et seq.*, or the adjudicated cases in which this Court may go behind other Court determinations, it is the considered judgment of this Court that the defense of *Res adjudicata* is inapplicable and is accordingly overruled.

## VALIDITY OF SECURITY AGREEMENT

The Defendant questions the validity of the security agreement as well as its description of the collateral sought to be secured therein. The language of the security agreement, which was filed of record in the Circuit Court of Botetourt County Clerk's Office defines the collateral as "furniture, accessories as stated on sales # 2203 # 2218 # 2239". This is the only description contained in the security agreement and the agreement does not have affixed to it the sales invoices referred to therein. They were attached and filed of record with "Exhibit 1" in these proceedings. The invoices referred to list various items of furniture as follows:

Invoice 2203 recites "4 Bedroom Suites (Thomasville 3, Ga. Pac) Living Room Suite, Family Room Suite, Dining Room Suite, Dinette Suite, 5 pc. Party Table, accessories for entire house, wallpaper (D.R.) Foyer, Hall), Carpet (Entire House) Amana Deep Freeze     $25,197.89
Less discount for cash & trade-ins     5,197.89
                                        $20,000.00"

Invoice 2218 recites "5 pc patio, 1 umbrella, 1 chaise, 1 rocker, 1 chair & stool, 1 love seat, 1 clct table, 1 12x26 aster furq     $1,350.00
labor to install turq     69.50
                          $1,419.50"

Invoice 2239 recites "1 B.R. chair
price                    300.00
           amount        215.00

■ Virginia Code Section 8.9–110 provides that the description of collateral is sufficient "if it reasonably identifies what is described". The *Uniform Commercial Code* Statute has been construed more liberally than that placed upon former conditional sales contracts and chattel mortgages. It is essentially "notice" filing. If the description gives "notice" to a third party who upon reasonable inquiry can determine what is, in fact, included as collateral secured thereby it is sufficient. This means that the third parties must inquire and ascertain once he is on "notice". In *J. K. Gill Company v. Fireside Realty* (1972) 262 Or.

486, 499 P.2d 813, 11 U.C.C. 202, the Court therein dealt with a description as follows: "furniture as per attached list". There was no such list attached. There was serious question as to the existence of such, whether attached or otherwise. The Supreme Court of Oregon held such description was insufficient. See also *Rasch v. Passport*, 9 U.C.C. 507.

The *Gill* case is distinguishable from the case at bar. The sales invoices referred to in the security agreement are available and the items contained thereon are ascertainable. Here, there are actual numbered invoices referred to. It would appear that although the question of the adequacy of such description is subject to different construction which may not 'accord with the *Gill* case, *Supra*; nevertheless, it is the view of this Court that, although abbreviated, and given to serious question, the description is sufficient "notice" where the invoices are available. This is in accord with the construction placed upon the Code provisions by the 4th Circuit of Appeals Re: *Varney Wood Products, Inc.* (W.D.Va.1971) 327 F.Supp. 425, rev. (4th Cir.) 458 F.2d 435, 10 U.C.C. 513. Therein, the 4th Circuit Court of Appeals reversed the District Court for a too narrow construction upon the description of collateral. The Court stated: "[a]ll that is required under the Code, then, is that the financing statement be sufficiently descriptive so as reasonably to generate further inquiry."

The security agreement in the case at bar was used as a financing statement and as such would have been adequate to give "notice" if, in fact it had been a financing statement. It would appear to also be sufficient as a security agreement.

An issue may exist as to whether or not the filing of the security agreement of record in Botetourt County on March 16, 1979, within four months of the petition herein on July 6, 1979, was a preferential transfer under *Section* 60 of the *Bankruptcy Act*. The security agreement was executed on November 6, 1978, beyond the four month period. The purchase money security agreement of consumer goods does not require recordation under the *Uniform Commercial Code*. However, if the security agreement was the result of collateral financing, then its perfection within the four (4) month period might be preferential. To so find *Section* 60 also requires a showing of insolvency at the time and knowledge or reasonable belief by the creditor of such. No evidence was admitted directly thereon, and hence, the Court cannot so find.

The most compelling issue before the Court is the question of whether or not when considering these facts in their entirety, the transaction was not of such import as to bring it within the provisions of unconscionability. Section 8.2–302 [1]

[1] 8.2–302. *Unconscionable contract or clause.*—(1) "If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result."

(2) "When it is claimed or appears to the Court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination. (1964, c 219.)"

*Volume* 3 of *Bender's UCC Service*, Section 4.08(2)(b) the author recites the following with reference to the foregoing Section:

(b)—*The Proscription Against Unconscionable Bargains.* "Section 2–302 is among the most preeminent and controversial sections of the Code. Setting forth the canon on unconscionable contracts, it is said to be designed, along with the rules on good faith in performance and enforcement, to establish a boundary of fair dealing. Unlike the section on good faith, where the observance of that standard is mandated in the performance of a contract, Section 2–302 does not require the absence of unconscionableness; it only prescribes that a court *may* refuse to enforce a contract or clause on the basis of its being found to be unconscionable. The distinction is doubtless one without a difference, *however, for a determination of unconsciona-*

*bleness can be expected to have the consequence of unenforceability of the challenged term, or even of an entire contract.* For this reason, the section may properly be described as a statutory proscription of unconscionable bargains." (emphasis added)

 The facts relative to unconscionability of this contract generally recited as follows: the Debtors moved to Virginia from West Virginia where the husband had taken the executive position with IME. The complete furniture delivery and installation had been made before their arrival and without their knowledge. The Debtors had no freedom to retract, reject or repudiate the furniture transaction, whether it be for cash or credit, since the Husband was for all intents and purposes at the time in question beholden to Dennis Costner and Willie Costner due to their official positions and relationship in the Furniture Company and IME. When all facts are considered, it would indeed be unconscionable for this Court to require total compliance with this agreement which was made upon such unequal terms that the harshness thereof would contravene the intent of the drafters of Section 8.2–302 of the Uniform Commercial Code. This would appear to be a classic case in which the drafters of the said Section may have had in mind.

It is for the further reason of this Court's latitude under the rehabilitative Chapter XIII proceedings that the determination hereafter is necessary to assist in that respect.

Accordingly, for the foregoing reasons, it is

### ADJUDGED AND ORDERED

that the furniture purchased, less the carpeting, drapes and wallpaper should be forthwith returned for liquidation by the Plaintiff in full satisfaction of its debt. The exclusion of the carpeting is so because the Court feels that the payments made by the Debtor is more than sufficient to cover the cost of the carpet and that the drapes and wallpaper are not properly secured in the security agreement, as they are neither mentioned nor incorporated in the security agreement or the invoices.