In re EASTERN EQUIPMENT COMPANY, a West Virginia corporation, Debtor.

LEASING SERVICE CORPORATION, a corporation, Plaintiff,

v.

EASTERN EQUIPMENT COMPANY, a West Virginia corporation, Defendant.

Bankruptcy No. 79–20347.

Adv. No. 80–0011.

United States Bankruptcy Court, S. D. West Virginia.

Jan. 15, 1981.

Susan Cannon-Ryan, Charleston, W. Va., for plaintiff, Leasing Service Corp.

Ralph W. Hoyer, Charleston, W. Va., for debtor, Eastern Equipment Co.

## MEMORANDUM OF OPINION

EDWIN F. FLOWERS, Bankruptcy Judge.

The Plaintiff, Leasing Service Corporation, seeks a determination of amounts due it by the Debtor, Eastern Equipment Company, under two separate contracts. Earlier in this proceeding Leasing Service had obtained possession of two construction cranes from the Debtor, recovered $4,100.00 in rental income which the cranes had produced for the Debtor, and received an accounting of the remaining revenue which the cranes had generated for the Debtor.

The Debtor, Eastern Equipment Company, held the cranes under two lease agreements on December 21, 1979, when it filed a voluntary petition under chapter 11 of the Bankruptcy Code. The Plaintiff subsequently filed a complaint to lift the automatic stay imposed by 11 U.S.C. § 362(a) or, alternatively, to compel the Debtor to assume or reject the unexpired leases. As a result of a preliminary hearing, the automatic stay was continued, with the Debtor to provide an accounting to Leasing Service of the income generated by re-leasing the cranes. At the final hearing, the Debtor confessed that it had chosen to pursue a liquidation plan under chapter 11. Consequently, the Court ordered the cranes turned over to Leasing Service, as well as $4,100.00 of rental income received by the Debtor through re-leasing. A further hearing was held to determine the amount due Leasing Service under the two agreements and the character of that indebtedness, whether it was secured or unsecured.

Leasing Service contends that it held a security interest in the two cranes and "any and all inventory, goods, equipment, machinery, fixtures and assets of any and every kind, wherever located."[1] Leasing Service further contends that, regardless of the nature of the agreements, it is contractually entitled to accelerate the entire balances due it on default by the Debtor. The Debtor contends that it held the cranes under simple leases and upon surrender of the cranes it owed Leasing Service only an unsecured amount for rent accrued and as yet unpaid. It submitted its Plan of Reorganization to the creditors on that basis.

A determination of the amount due Leasing Service depends upon the characterization given the agreement between the parties. Their agreement is evidenced by the documents which were produced at the trial. These reveal that the Debtor, Eastern Equipment Company, obtained two rough terrain cranes, a Grove Model RT–58 and a Grove Model RT–620, from Mountaineer Euclid, Inc., on January 25, 1978, by executing two separate agreements, each denoted "Equipment Lease Agreement." The leases identify Mountaineer Euclid as the "Lessor" and the Debtor as the "Lessee." The instruments, however, were obviously those of the Plaintiff, Leasing Service. The forms were supplied by Leasing Service, printed portions of which require all rental payments to be made to Leasing Service. The assignment portions of the documents also were completed on January 25, 1978, effecting the transfer of Mountaineer Euclid's interests to Leasing Service. In addition, two letters were written on the same date by the Debtor to Mountaineer Euclid asking that the Debtor be permitted to purchase the respective cranes at the end of each rental term for $1,731.65 and $2,406.46. The letters required the endorsement of Mountaineer Euclid to demonstrate its agreement to the exercise of the Debtor's options to purchase; however, no endorsed letters were produced at the trial. The leases show deletion of the option provisions and substitution of the words "No Purchase Option available hereunder" and "No Renewal Option available hereunder." Invoices prepared by Mountaineer Euclid recite the sale to Leasing Service of the Grove Model RT–58 crane for $79,910.00 and of the Grove Model RT–620 crane for $88,484.00. The leases and Uniform Commercial Code financing statements were filed in Nicholas and Kanawha Counties and with the Secretary of State for the State of West Virginia. Additionally, almost eighteen months later, in July of 1979, the West Virginia Department of Motor Vehicles issued Certificates of Title to Eastern Equipment on each crane reflecting first liens in favor of Leasing Service.

Closer examination of each "Equipment Lease Agreement" reveals the use of customary lease terminology. In addition to the identification of the parties as "Lessor" and "Lessee," the instruments call for installment payments of "Rent" and specify that "title to equipment shall at all times remain in Lessor." Total rent of $103,350.00 is reserved for the RT–58 crane, $1,950.00 to be paid on the date of the lease

---

1. Complaint at paragraph 19.

and the balance payable in fifty-two monthly installments of the same amount. The rent for the RT–620 crane is $113,950.00, payable in the initial installment of $2,150.00 and fifty-two monthly installments of $2,150.00 each. The lessee is required to pay all taxes assessed against the cranes and all insurance premiums, and bears all risk of loss or damage to the cranes as well as indemnifying the lessor for all liabilities arising out of their ownership and operation. The final paragraph, which precedes the signature lines, contains the following statement:

> In any jurisdiction where the Uniform Commercial Code is in effect Lessee grants to Lessor a security interest in the Equipment and any and all inventory, goods, equipment, machinery, fixtures and assets of any and every kind, wherever located, now or hereafter belonging to Lessee or in which Lessee has any interest and agrees that any security interest created by this agreement secures any and all obligations of Lessee at any time owing to Lessor, now existing and/or hereafter incurred.

The pleadings and proffered evidence present three questions for determination by the Court. First, are the leases intended as security under Article 9 of the Uniform Commercial Code, thus reserving a security interest in the cranes to the Lessor, Leasing Service? Second, do the leases grant Leasing Service a security interest in other property which the Debtor then owned or thereafter acquired? Third, to what amount of recovery is the Plaintiff entitled?

## I

### LESSOR'S INTEREST IN THE CRANES

■ Section 9–102(1)(a) of the Uniform Commercial Code [hereinafter UCC] extends Article 9 coverage "to any transaction (regardless of its form) which is intended to create a security interest in personal property." W.Va.Code § 46–9–102(1)(a) (1980 Cum.Supp.). The section applies to security interests created by lease. *Id.* § 46–9–102(2). The Official Comments set forth the theory behind the article:

> The main purpose of this Section is to bring all consensual security interests in personal property ... under this Article.... [T]he principal test whether a transaction comes under this Article is: is the transaction intended to have effect as security? ... Transactions in the form of ... leases are subject to this Article if the understanding of the parties or the effect of the arrangement shows that a security interest was intended.... When it is found that a security interest as defined in Section 1–201(37) was intended, this Article applies regardless of the form of the transactions or the name by which the parties may have christened it....
>
> The Article does not in terms abolish existing security devices. The conditional sale or bailment-lease, for example, is not prohibited; but even though it is used, the rules of this Article govern. [*Id.* § 46–9–102, Official Comments.]

Section 1–201(37) defines a "security interest" as:

> [A]n interest in personal property ... which secures payment or performance of an obligation .... Unless a lease ... is intended as security, reservation of title thereunder is not a "security interest" .... Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security. [*Id.* § 46–1–201(37).]

Article 9 neither creates new security devices nor abolishes existing ones; it does carry over the pre-Code distinction between true leases and those leases intended to constitute conditional sales or bailment-leases. While section 1–201(37) gives some guidance in determining the nature of

agreements, courts have resorted to pre-Code law to help determine whether agreements are true leases or those intended to create security interests.

The "intent" required by the UCC is not the subjective intent of the parties; rather, it is of objective intent gleaned from "the facts of each case." *See* 1 Gilmore, *Security Interests in Personal Property*, § 11.2, 338 (1965); Coogan, *Leases of Equipment and Some Other Unconventional Security Devices: An Analysis of UCC Section 1–201(37) and Article 9*, 1973 Duke L.J. 909, 916 n.12; Peden, *The Treatment of Equipment Leases as Security Agreements Under the Uniform Commercial Code*, 13 Wm. & Mary L.Rev. 110, 137 (1971). *See also* Annot., 76 A.L.R.3d 11, § 4 (1977). The objective test dictates that the substance of the transaction, rather than its form or the parties' declarations of intent, establishes intent.

The parties have given conflicting statements of intent. At the preliminary hearing on March 21, 1980, the Debtor contended by counsel that the transactions were sales by Mountaineer Euclid to it. Transcript at 37, 60. Leasing Service initially contended that the transactions were leases. Transcript at 4, 37, 54. In subsequent statements at the same hearing, however, Leasing Service maintained that the transactions were both leases and sales, whichever better served its purpose:

A We take the position that [the Debtor is] leasing the equipment and we take the position that he owns the equipment. We just—if I may say to you as an attorney, if you would want to plead some relief from the Court, you take alternate pleadings and whichever relief the Court would grant you.

So, we are cautious enough to do all the steps we have to, whether it's going to be treated as a lease or treated as a security agreement. We take either position and we just cover ourselves. [Testimony of Seymour Serebnick, Transcript at 47, 48.]

Since that early date the parties have become less equivocal, the Debtor acknowledging an obligation only as a true lessee of

the cranes, while Leasing Service has become firmly convinced of its position as a secured creditor. Hindsight helps not only courts in determining intent. The following factors, identified by Peden, *supra*, lead this Court to the conclusion that the transactions were intended as security.

A. *The instruments.*

1. While the Plaintiff titled the instruments "Equipment Lease Agreement" and used terms common to leases throughout, the documents nevertheless contain an explicit grant of a security interest in property. In terms which yield to no contrary interpretation, the instruments recite that the "Lessee grants to Lessor a security interest." These instruments must be deemed security agreements within the meaning of section 9–105(1)(*l*) of the UCC. W.Va.Code § 46–9–105(1)(*l*) (1980 Cum. Supp.). The written instruments, which are signed and contain a description of collateral, thus meet the requisites necessary to enforce a security interest under the UCC. *Id.* § 46–9–203(1)(a). Perfection of the security interests was accomplished by recordation of UCC financing statements and by causing the liens to be recorded on the face of the motor vehicle titles as required by state law. West Virginia Code § 46–9–302 (1980 Cum. Supp.); § 17A–4A–1 (1974 Replacement Vol.). Thus, with notice given, no other creditor of the Debtor who carefully examines the entire document can be misled as to the claim of a security interest by Leasing Service in the cranes and in other assets.

2. The Debtor had an option to purchase the cranes. While the leases deleted such a privilege, the separate instruments, prepared simultaneously with the leases and retained as part of the documents of the transaction, are convincing evidence of the intent of the parties to provide options to purchase. Mr. Serebnick, corporate counsel for Leasing Service, testified:

Q Now, what happens at the end of the term of this agreement? Now, I'm not asking you specifically as it relates to the particular contracts that you have in

front of you, but as it relates hypothetically—and I'm sure these hypotheticals do exist—for other customers that you handle and the normal trade of your business, what happens to these contracts when the balance of the purchase price—the balance of this lease price is paid in full?

A Well, we still own the equipment, and if the lessee desires to purchase the equipment we make arrangements to sell the equipment to him.

Q What are those arrangements?

A What?

Q What are those arrangements, normally?

A Well, *there may have been some agreement, as there was in this case, before the lease was entered into*, as to what price they may sell it, if they perform under the lease. [Transcript at 35–36.] [Emphasis supplied.]

Q Mr. Serebnick, in your calculation of the balance due on the lease, have you included any amount for an optioned purchase?

A No, I did not. We feel that *since the lessee is in default* under the lease, they have no option to purchase the equipment. [*Id.* at 26, 27.] [Emphasis supplied.]

The clear implication of Mr. Serebnick's testimony is that Leasing Service intended to permit the Debtor to purchase the two cranes at the conclusion of the lease term, provided the Debtor had complied with all of the lease terms.

3. In the event of default, the leases permit the acceleration of all remaining installments due Leasing Service under the lease. Acceleration would likely be unenforceable as a penalty in a lease unless it bears a reasonable relationship to the damages sustained. *See* Peden, *supra*, at 130. On the contrary, it is a "substantial indication" of a secured transaction. *Id.* at 149.

B. *Economic factors.*

1. Over the four and one-half year term of the leases, the Debtor would have paid considerably more than the purchase price of the leased cranes. The RT–58 crane was sold by Mountaineer Euclid to Leasing Service for $79,910.00. The lease assures Leasing Service a recovery of $103,350.00, an increase of 29.33% over the purchase price. The RT–620 crane was sold to Leasing Service for $88,484.00, while the lease contemplated a rental income of $113,950.00. The transactions have the appearance of financed sales to the Debtor at an approximate interest rate of 11¼%.[2]

2. The purchase option amounts of $1,731.65 and $2,406.46 are relatively low in comparison to the total lease payments. While the amounts may not be sufficiently nominal in themselves to make the leases ones intended as security under section 1–201(37) of the UCC, they influence such a conclusion. It is unlikely that the cranes would not have at least a scrap value considerably in excess of the option price, if kept in working condition throughout the leasehold period.

C. *Nature of the parties' business.*

1. Leasing Service, while denominated the lessor of the equipment, is certainly not a lessor in the normal sense of the word. Mr. Serebnick testified that the Plaintiff "made a credit decision to purchase the payments due under the lease . . . ." Transcript at 19. "In other words, we bought the equipment with a lessee. You don't want to buy the equipment without a lessee. We bought the equipment with a lease agreement." *Id.* at 44. The true financing nature of this arrangement is also evidenced by the fact that the equipment essentially was acquired especially for the Debtor, rather than as an initial inventory item for Leasing Service.

2. The Debtor was not the primary user of the leased equipment. As a regular les-

---

**2.** The interest rate was calculated by dividing the monthly payments, $1,950.00 and $2,150.00, by the initial purchase prices, $79,910.00 and $88,484.00 respectively, to obtain a "factor." The factor was then converted to an interest rate, using compound interest tables contained in C. Gushee, *Financial Compound Interest and Annuity Tables* (5th ed. 1970).

sor of equipment itself, the Debtor would likely have a continuing, rather than a temporary, need for two cranes.

While the instruments, the testimony, and the contentions of the parties are susceptible to interpretation of a lease or a lease intended as security, for the foregoing reasons the Court concludes that the parties entered into a lease intended as a secured transaction.

## II

### LESSOR'S INTEREST IN OTHER PROPERTY

■ While it is sufficiently clear that the leases were in substance security agreements as to the "leased" cranes, somewhat greater difficulty is encountered in determining whether the additional grant of a security interest in "inventory, goods, equipment, machinery, fixtures and assets of any and every kind" must be recognized.

The words are sufficient to grant a security interest, but the hidden location of the grant in the instruments and the lack of description of any collateral is a surprising, if not unfair, result to give an instrument which the Plaintiff called a lease. The UCC is generous in its requirement of identification of collateral. It provides that:

> For the purposes of this article any description of personal property or real estate is sufficient whether or not it is specific if it reasonably identifies what is described. [W.Va.Code § 46–9–110 (1966).]

In this Circuit, such words as "inventory," "goods," and "equipment" are adequate to identify the additional collateral which the Plaintiff seeks to recover. *In re Varney Wood Products, Inc.*, 458 F.2d 435 (4th Cir. 1972); *In re Cawthorn*, 1 B.R. 267 (Bkrtcy., W.D.Va.1979). In this case, however, the Plaintiff did not demonstrate the existence of any property to which the additional lien could attach. The Plaintiff's initial pleading seeks recognition of such a lien (Complaint at paragraph 19); Mr. Serebnick, a witness for the Plaintiff, testified with regard to this provision (Transcript at 27–28); at the preliminary hearing, this Court recognized the need to determine this matter at the final hearing (Transcript at 67). No evidence was offered to establish that the Debtor then had or thereafter acquired other collateral to which this provision of the lease could apply. The Debtor had assets of a type that may have been the object of such a grant at the time of the confirmation hearing on its chapter 11 plan, but it is not clear whether these assets were pre-existing at the time of the leases or subject to a priority lien of another secured creditor. *See* W.Va.Code §§ 46–9–312(3) and (4) (1980 Cum. Supp.). Of course, since the Plaintiff established the existence of the two cranes, under this security clause each crane would constitute collateral to further secure the indebtedness on the other lease. In other words, the RT–58 crane would be additional security for the balance remaining on the RT–620 crane, and vice versa. The indebtedness on each lease is, therefore, deemed secured by both cranes, but not by any other collateral in light of the Plaintiff's failure to meet its burden of proof.

## III

### RECOVERY

■ Notwithstanding recognition that the cranes serve as security for the debt due Leasing Service, recovery by the Plaintiff is limited by several factors. The default provisions of Part 5 of the UCC must be applied and, in addition, the Plaintiff is entitled to enforcement of the default remedies provided by the leases to the extent permitted by the UCC and other state law. Finally, as a claim filed in a bankruptcy proceeding, recovery on the claim must be determined under applicable sections of the Bankruptcy Code.[3]

---

**3.** Subsequent to the instant proceeding, Leasing Service filed a proof of secured claim in the amount of $63,553.20, to which claim the Debtor objected in writing. Since the subject matter of the claim and the objection thereto have been fully litigated in this adversary proceeding, no further hearing thereon is deemed necessary.

A secured creditor is afforded the rights and remedies provided in Part 5 of the UCC as well as those contained in the security agreement. W.Va.Code § 46–9–501(2) (1980 Cum. Supp.). To the extent, then, that the lease-security agreements are not inconsistent with UCC provisions, or other applicable law, the remedies provided in the leases can be enforced. With one exception, which will be discussed below, the contractual remedy sought by Leasing Service is consistent with the UCC. Both the leases and the UCC permit the Plaintiff to accelerate the balances due, to repossess the equipment and thereafter to sell it in a commercially reasonable manner, applying the proceeds against the accelerated debt balance. *See* W.Va.Code § 46–1–208 (1966); § 46–9–501 *et seq.* (1966 and 1980 Cum. Supp.).

While the UCC allows acceleration of the contract balance upon default by a debtor, W.Va.Code § 47–6–5a requires the exclusion of unearned interest from the debt balance. The debt balance is reduced by the amount of unearned interest as calculated by the "Rule of 78s." W.Va.Code § 47–6–5a (1976 Replacement Vol.). Exclusion of the unearned interest is also required by section 502(b)(2) of the Bankruptcy Code.[4] The legislative history of section 502(b)(2) specifically refers to the disallowance of interest that is unmatured or unearned as of the date of the bankruptcy. H.R.Rep.No.95–595, 95th Cong., 1st Sess. 352–53 (1977); S.Rep.No.95–989, 95th Cong., 2d Sess. 62–63 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. The new Bankruptcy Code codifies the general rule against allowance of postpetition interest, even as to secured creditors, by defining a "claim" as a "right to payment, whether or not such right is . . . secured, or unsecured. . . ." [11 U.S.C. § 101(4)(A)] and then by the specific disallowance of a claim for unmatured interest in section 502(b)(2).

Under the old Bankruptcy Act, it was well-settled that postpetition interest on secured claims was denied unless the collateral was valued in an amount greater than the principal and interest due. The rule was applicable to the rehabilitation chapters of the Act as well as the liquidation chapters. *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed. 162 (1946); *United States v. Edens*, 189 F.2d 876 (4th Cir. 1951), *aff'd*, 342 U.S. 912, 72 S.Ct. 357, 96 L.Ed. 682 (1952); 3 *Collier on Bankruptcy* ¶ 502.-02[2][b] (15th ed. 1980). This exception to the general rule disallowing interest earned after the bankruptcy filing date is contained in section 506(b) of the Bankruptcy Code. Section 506(b) permits recovery of postpetition interest on a secured claim, as well as any reasonable contractual fees, costs, or charges, but only to the extent that the "allowed secured claim is secured by property the value of which . . . is greater than the amount of such claim . . . ." 11 U.S.C. § 506(b).

Application of the above provisions of the UCC, chapter 47 of the West Virginia Code, and the Bankruptcy Code to the facts of this case dictate the following result. As a secured creditor, Leasing Service, under the terms of the security agreements, is entitled to accelerate the balances due upon default by the Debtor. Section 502(b)(2) of the Bankruptcy Code requires the deduction of unmatured or unearned interest from the accelerated balances. This is accomplished by the application of the Rule of 78s as dictated by W.Va.Code § 47–6–5a. On December 21, 1979, the date of the bankruptcy filing, the Debtor owed 30 payments on each lease, producing an unpaid balance of $58,500.00 on the RT–58 crane and $64,-500.00 on the RT–620 crane. Transcript at 24, 26. Deducting the unearned interest as of the date of bankruptcy reduces these debts respectively to $51,248.30 and $56,-

---

4. "[T]he court . . . shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

. . . .

"(2) such claim is for unmatured interest; . . ." [11 U.S.C. § 502(b)(2).]

632.12.[5] These are the amounts which the Debtor would have been required to pay as of the date of bankruptcy to "pay off" Leasing Service. Except for the application of section 506(b) of the Bankruptcy Code, this is the maximum recovery which could be allowed Leasing Service under bankruptcy law. As noted above, section 506(b) creates an exception to the rule against allowance of postpetition interest in the case of secured claims. Its provisions enable a creditor with a secured claim to recover "interest on such claim, and any reasonable fees, costs, or charges provided under the agreement under which such claim arose" to the extent of the value of the secured property. The best proof of the value of the secured property in this case is the proceeds from its sale after Court-approved repossession by Leasing Service. At the sale conducted on June 18, 1980, Leasing Service received $50,000.00 for the RT–58 crane and $60,000.00 for the RT–620 crane, and incurred expenses of $4,824.85 in making the sales. Deducting the sale expenses equally and adding to the result $1,950.00 and $2,150.00 respectively for the payment ordered during the pendency of the case, the net value of the secured property is $49,537.58 for the RT–58 crane and $59,737.57 for the RT–620 crane.

Since the claim secured by the RT–58 crane at the time of the bankruptcy petition was $51,248.30 and the value of the crane was established as $49,537.58, no interest, fees, costs or charges may be recovered on this debt. 11 U.S.C. § 506(b). However, under section 506(a), the creditor's claim is divided into two parts. The claim is secured only "to the extent of the value of such creditor's interest . . . in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim." 11 U.S.C. § 506(a). Thus, Leasing Service has an unsecured claim for the deficiency of $1,710.72.

The claim secured by the RT–620 crane at the time of the bankruptcy petition was $56,632.12, while the value of this crane, as calculated above, was $59,737.57. The value of the crane being in excess of the claim, interest, fees, costs or charges may be recovered to the extent of that value. The excess of $3,105.45 is thus available to Leasing Service by application of the terms of the lease as authorized by section 506(b).

Postpetition interest on this debt would be earned from the date of bankruptcy filing to the date the sale proceeds were available to the creditor. Recalculating the interest rebate as of June 18, 1980, under the Rule of 78s produces postpetition earned interest of $3,197.91.[6]

5. The interest charged on each lease is calculated as follows:

| Equipment Item | RT–58 | RT–620 |
|---|---|---|
| Gross Lease Amount | $ 103,350.00 | $ 113,950.00 |
| Down Payment | 1,950.00 | 2,150.00 |
| Amount Financed | 101,400.00 | 111,800.00 |
| Purchase Price | 79,910.00 | 88,484.00 |
| Precomputed Interest | $ 21,490.00 | $ 23,316.00 |

The rule of 78s is also referred to as the "sum-of-the-digits" method of computing interest rebates. The two leases provide for full repayment, including precomputed interest, over 52 months. To determine how much interest is paid each month, the sum of the digits for 52 months must be calculated. The sum of the digits 1 through 52 is 1378. In the first month 52/1378 of the total interest charged is earned; 51/1378 is earned in the second month, and progressively down to 1/1378 in the last month. To determine the unearned interest to be rebated, the sum of the digits of the remaining installments must first be calculated. As of the date of the bankruptcy filing, the Debtor owed 30 monthly installments on each lease. The sum of the digits 1 through 30 is 465. Thus, 465/1378 of the total interest charged over the lease periods is unearned at the time of the bankruptcy filing and is to be rebated. 465/1378 of the total interest of $21,490.00 on the RT–58 is $7,251.70. 465/1378 of the total interest of $23,316.00 on the RT–620 is $7,867.88. Deducting the unearned interest from the respective unpaid balances of $58,500.00 and $64,500.00 reduces these debts to $51,248.30 and $56,632.12. See In re Willis, Jr., 6 B.R. 555, 6 B.C.D. 1101 (Bkrtcy., N.D.Ill. 1980), for a more complete illustration of the use of the Rule of 78s.

6. As of June 18, 1980, the date of sale, 23 installments were due and owing, and 29 months of interest had been earned. Thus, the remaining 23 months of interest would be unearned if the balance due was paid in full on that date and should be rebated. Referring to the explanation in footnote 5, supra, the sum of

Additionally, the lease provides for a charge of $\frac{1}{15}$ of 1% per day on a "delinquent payment ... from the date when such payment was due until paid" and for "15% of total rent" to be further deducted from the sale proceeds. While Leasing Service did not seek allowance of the latter charge, the percentage would appear to have no direct relationship to damages incurred and thus would be deemed unenforceable as a penalty in equity and unavailable as a reasonable expense at law under the UCC and Section 506(b) of the Bankruptcy Code. The charge for delinquent payments of $\frac{1}{15}$ of 1% per day essentially is an interest charge for the Debtor's use of the lease payments not made. The Debtor was current in all lease payments at the time of bankruptcy but failed to make the payments which were due on the 25th day of each month from December of 1979 through May of 1980. The cumulative days of delinquency from December 25, 1979, through the sale date of June 18, 1980, on the six missed installments, total 598. The number of delinquent days times the late charge of $\frac{1}{15}$ of 1% times the installment amount of $2,150.00 produces a delinquency charge of $857.13. Leasing Service's contention that the delinquency charge is based on the accelerated payments which had not become due is simply not in accord with the plain terms of its agreement.

Leasing Service seeks recovery of attorney fees based on a clause in the agreement which provides that:

Lessee hereby irrevocably authorizes any attorney of any Court of Record to appear for and confess judgment against Lessee (except in any jurisdiction where such action is not permitted by law) for the Balance plus reasonable attorney's fees which are hereby agreed to be no less than 20% of any amount sought ...."

Even were confession of judgment permitted in this jurisdiction, the recovery of percentage fees based upon this clause would be inapplicable to the instant action which does not involve confession of judgment. Moreover, section 506(b) limits recovery of postpetition fees to the extent they are reasonable. The attorney fees were stipulated to be $3,418.25.[7] Counsel for Leasing Service itemized by dates and by description the legal services on which the stipulation is based. Considering the services rendered, even without itemization of the time expended for the various components, the fee is deemed reasonable.

Therefore, against the excess value of the collateral over the debt at the date of bankruptcy, the secured creditor could accrue additional earned interest of $3,197.91, attorney fees of $3,418.25, and delinquency charges of $857.13. These charges total $7,473.29. Since their total is greater than the excess value of $3,105.45, Leasing Service's recovery on these items is limited to $3,105.45, which it has already received as part of the sale proceeds. Sections 506(b) and 502 preclude allowance of any claim for the deficiency on the remaining postpetition interest, attorney fees, costs or charges. Additionally, since the prepetition debt for the RT–620 crane was covered in full by the sale proceeds, Leasing Service is not entitled to claim any deficiency on that debt. Since charges under the RT–620 lease fully consume the excess, the cross-collateral clause in the RT–58 lease is ineffective to secure any deficiency resulting from the sale of the RT–58 crane.

An order consistent with these findings of facts and conclusions of law will be entered.

the digits 1 through 23 is 276. Thus, 276/1378 of the total interest charged, or $4,669.97, would be rebated on the June 18, 1980, payoff date. Subtracting the rebate of $4,669.97 from the rebate allowed on the bankruptcy filing date, or $7,867.88, yields earned postpetition interest in the amount of $3,197.91.

7. The stipulated attorney fees totaled $6,836.50. However, applying the fees equally between the two cranes, $3,418.25 may be charged against each.