In re VICTORIA HARDWOOD LUM-
BER COMPANY, INC., Debtor.

VICTORIA HARDWOOD LUMBER
COMPANY, Plaintiff,

v.

CECIL I. WALKER MACHINERY
CO., Defendant.

Bankruptcy No. 2–88–02190.
Adv. No. 2–88–0175.

United States Bankruptcy Court,
S.D. Ohio, E.D.

Nov. 7, 1988.

See also, Bkrtcy., 95 B.R. 947.

Richard T. Ricketts, Wesp, Osterkamp & Stratton, Columbus, Ohio, for Plaintiff, Victoria Hardwood Lumber Co., Inc.

Richard M. Francis, Bowles, McDavid, Graff & Love, Charleston, W.Va., and James H. Prior, Porter, Wright, Morris & Arthur, Columbus, Ohio, for defendant, Cecil I. Walker Machinery Co.

James H. Gordon, Columbus, Ohio, for Holt–Refakis Equipment Co.

OPINION AND ORDER ON COUNTS I & II OF COMPLAINT AND ON MOTIONS TO COMPEL ASSUMPTION OR REJECTION OF LEASE AND RENTAL AGREEMENTS

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before the Court after trial of Counts I and II of this Complaint, combined with hearing of the related portions of two Motions to Compel Assumption or Rejection of Lease and Rental Agree-

ments (the "Motions"). Cecil I. Walker Machinery Co. ("Walker") is the defendant in this adversary and the movant of the Motions, filed in the related Chapter 11 bankruptcy case of Victoria Hardwood Lumber Company, Inc. ("Victoria"). Victoria is the plaintiff in this adversary and a debtor-in-possession before this Court. Although these matters were consolidated for hearing and purposes of trial with similar matters affecting another creditor of Victoria, this opinion is issued separately for reasons of clarity.

The Court has jurisdiction under 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. Both the Motions and the Complaint, for which Counts I and II seek a judgment declaring the nature of certain transactions between Victoria and Walker, are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(K) & (M) in which this bankruptcy judge may enter final orders.

## I. FINDINGS OF FACT

### A. The Transactions

#### 1. *Order # 1.*

On or about August 19, 1987 Victoria, through its president Ervin Tackett, entered into a purchase order contract with Walker involving a new Caterpillar D4H tractor, (serial number 8PBO1337), a new Caterpillar # 4P Bulldozer, and a new Carco 50 APS winch (serial number 8700911) ("Order # 1"). The total negotiated price of $73,412 for all three items with attachments, if the machinery were financed for purchase, appeared on the form as the "insurance value". That amount is also the value for which Victoria was obligated to insure the equipment. Initially, Victoria was to make six monthly rental payments of $3200 each. Upon the end of the rental periods, those payments were to be applied in full against the purchase price if Victoria determined to purchase the equipment. If additional rental periods were required, the payments would increase to $4,950 each month for the second six-month period and to $6,600 for the third such period.

About one week thereafter, the equipment in Order # 1 was delivered to a site in West Virginia where Victoria was engaged in a logging operation. On September 14 and 16, 1987, Victoria and Walker, respectively, executed a Rental Agreement ("Lease # 1"), setting forth the payments required over the term of the lease. Other terms required Victoria to maintain, repair and insure the equipment, to pay any applicable taxes, and to indemnify Walker for any loss or damage to the equipment. Apparently UCC–1 financing statements were also obtained and were filed with the Secretaries of State for Ohio and West Virginia and with the County Recorders of Pike County, Ohio and Kanawha County, West Virginia.

Because Victoria was considered a marginal credit risk, rental charges were invoiced in advance of the period of usage and the first payment was made at the time the purchase order was executed. Victoria made all six payments under Lease # 1. Walker had the equipment for Order # 1 in its existing inventory and had paid its supplier, Caterpillar, Inc., for the machinery prior to its shipment to Victoria.

#### 2. *Order # 2.*

Also on or about August 19, 1987, Victoria entered into another purchase order contract with Walker involving a new Caterpillar # 518 skidder (serial number 94UO1733) ("Order # 2"). The negotiated price or insurance value for that equipment was $71,606. Again, the arrangement was for an initial lease of at least six months' duration with payments of $3,300 each month, to be paid in advance of usage. If additional rental periods were required, the payments would increase to $4,950 each month for the second six-month period and to $6,600 each month for the third such period. The first payment was made at the time Order # 2 was executed.

The skidder and its specified attachments were shipped to Victoria's job site in West Virginia on or about August 24, 1987. Again a rental agreement was executed by Victoria and Walker on September 14 and September 16, 1987, respectively ("Lease

#2"). Except for the payment amounts, the terms of Order #1 and Order #2 were identical. Victoria made six payments under Lease #2. Curiously, although the first lease payment for the skidder was made at the time Order #2 was signed and the next installment was invoiced to Victoria on September 21, 1987, the manufacturer's statement of origin for that equipment did not certify a transfer from Caterpillar, Inc. to Walker until October 22, 1987. UCC-1 financing statements were obtained and were filed with the Secretaries of State for Ohio and West Virginia and the County Recorders of Pike County, Ohio and Kanawha County, West Virginia.

### 3. Order #3.

On or about February 10, 1988, Victoria entered into a third purchase order with Walker for a new Caterpillar Skidder #518 (serial number 94U1839) ("Order #3"). This equipment had a negotiated price or insurance value of $73,925. Again, the equipment initially was to be rented for a period of six months and payments were invoiced in advance each month in the amount of $3,300. If additional rental periods were required, the payments would increase to $4,400 each month for the second six-month period and to $6,600 for the third such period. The first payment was made at the time Order #3 was executed. The skidder and its specified attachments were shipped from Walker's existing inventory to Victoria's job site in West Virginia within several days of the execution of Order #3.

Victoria and Walker executed a lease for the equipment on Order #3 on February 24, 1988 ("Lease #3"). The first installment of rent was paid when Order #3 was executed and the next installment was invoiced to Victoria on March 10, 1988. UCC-1 financing statements were filed with the Secretaries of State for Ohio and West Virginia and the County Recorders of Pike County, Ohio and Kanawha County, West Virginia. This skidder had been transferred from Caterpillar, Inc. to Walker on December 22, 1987, and Walker had paid Caterpillar for the equipment prior to its delivery to Victoria. It is disputed

whether this equipment was available on six-month interest-free conversion terms.

### 4. Order #4.

The final transaction between Victoria and Walker involved a purchase order, dated March 8, 1988, pursuant to which Victoria apparently contracted for a used Caterpillar D4B tractor, a used Caterpillar 4P bulldozer, and a used Caterpillar 53 winch ("Order #4"). Testimony about this transaction was confusing and the equipment may have been a temporary replacement for other machinery for the West Virginia job which was in repair. No invoices were ever sent for Order #4 and no rental agreements were produced. For purposes of this action, the Court is not ruling on issues relating to Order #4.

### B. Facts Related to the Transactions Generally

Walker is a West Virginia corporation which sells, leases and services equipment primarily for use in mining or industrial applications. Walker is a Caterpillar dealer, although it also sells machinery of other manufacturers. At any given time Walker has between $5,000,000 and $20,000,000 or 30–130 units in its "rental" inventory. About 50% of Walker's transactions are rentals; that percentage is higher in the logging industry. Although most of Walker's rentals convert to sales transactions, the percentage of such conversions is lower in the logging industry.

Victoria, through Tackett, first approached Walker in August, 1987 with a request about the availability of certain equipment for use in connection with a job Victoria had in Tanner, West Virginia. Although Victoria asked about the 12-month "interest-free" rental it had gotten previously from another Caterpillar dealer, Walker did not have such an option available. However, Walker offered Victoria a six-month rental option which provided for application of all rental payments to any subsequent purchase. Some of Tackett's conversations in connection with these transactions were with Walker's field sales

representative and some were with personnel at Walker's offices in West Virginia.

Sometime in January or February, 1988 Tackett, on behalf of Victoria, again visited Walker's offices. The primary purpose for that visit was to make payments on the equipment then under lease from Walker. At that time Tackett indicated to Walker's representative that Victoria wanted to purchase all the equipment then being rented from Walker. Tackett discussed converting the leases of equipment to financed purchases and simultaneously trading in a used John Deere machine to decrease the take-out balances. Tackett brought Victoria's financial statement to Walker's representative in support of that objective. There were several liens against the John Deere equipment, however, and Walker never approved any financing for Victoria to purchase its equipment. Although the parties agree that Victoria could have purchased the equipment at the end of the rental period, no formal purchase option appears on the documents.

Testimony established that depreciation of the types of logging equipment involved in these transactions may be approximately 25%–30% of the original price over the first year or 15%–18% over the first six months of usage. Although those figures contemplate depreciation from list price, as a practical matter the residual value after the period of depreciation has to be related to the market or discounted price. Therefore it is fair to assume that an owner or dealer would expect to sell the equipment after six months of usage at approximately a 20%–25% reduction from its original price. The structure of the payments under the lease agreements were such that 26%–27.5% of the negotiated price was paid over the first six months. Had Victoria purchased the equipment on Orders #1, #2 and #3 at the conclusion of the six-month rental term, the take-out balances would be the negotiated prices minus the six rental payments on each order. Those amounts are approximately $52,000–$54,000. Those remaining balances are not determined by the fair market value of the equipment at the time the purchase options are exercised, but by the formula as stated.

It appears that Walker receives approximately a 30% discount from list price in its purchases from Caterpillar and the negotiated price to Victoria represents a passing on of about two-thirds of that discount.

C. The Inventory Management Assistance Plan

To assist its dealers in selling equipment, Caterpillar, Inc. ("Caterpillar") instituted an Inventory Management Assistance Plan ("IMAP"). Under the 1987 version of IMAP, as it existed at the time Victoria entered into Orders #1 and #2, a dealer was permitted to offer its customers initial rental periods up to 12 months with all rental payments applied directly against the purchase price of the equipment upon exercise of the accompanying purchase option. Alternatively a dealer could offer subsidized lower interest rates for a sale financed through Caterpillar's financing entity. Under either such arrangement the dealer's obligation to pay Caterpillar for the equipment arises only upon the earlier of ten days subsequent to the customer's exercise of the purchase option, six months from the first "rental" or nine months from the date of invoice from Caterpillar to the dealer. Only a certain portion of a dealer's inventory, determined by a formula from Caterpillar, is eligible for inclusion in the IMAP program.

The IMAP program benefits the customer by permitting a financing of the down payment through an initial rental period, which, in essence, becomes a period without interest if the sale proceeds to conclusion. IMAP also benefits the dealer by permitting it to defer its remittance to Caterpillar.

Changes occurred in the structure of the IMAP program between 1987 and 1988. According to Victoria, Caterpillar's internal communications to its dealers indicated the most significant changes were responses by Caterpillar to certain "false rental" abuses by its dealers. Those changes required a dealer to declare a transaction to be a "sale", thus commencing the dealer's obligation to remit payment to Caterpillar within ten days, where the customer's in-

tent was clearly to purchase the equipment. This directive is applied not only to initial sales evidenced by installment sales contracts, but also applied to "full payout finance leases" evidenced by initial rental periods with options to purchase. If the rental provisions were used, subsidized financing for the take-out period of the subsequent loan to complete the purchase was not available, as only one form of subsidy was available to a customer for a given transaction.

## II. ISSUES OF LAW

By agreement of the parties the issues before the Court at this time are limited as follows:

A. Whether the transactions in question between Walker and Victoria are "true leases" or financing (security) arrangements;

B. If the Court determines that the transactions are "true leases", then the Court shall consider those issues set forth in Count Two of the Adversary Proceeding, which seeks a finding that such leases automatically converted to a financing arrangement at the end of the rental period; and

C. If the Court determines that the transactions are "true leases", then the Court shall consider those issues raised by the Motions with respect to the timing of Victoria's assumption or rejection of such leases.

## III. CONCLUSIONS OF LAW

A. True Leases or Financing (Security) Arrangements

Victoria asserts that its transactions with Walker were not true leases, but were financing arrangements for the purchase of the equipment described in Orders # 1, # 2 and # 3. Victoria argues that the initial form used by Walker was a purchase order form, all or most of the burdens of ownership were upon Victoria, the so-called rentals were just a method of financing the required down payments and the remaining price to be paid if the purchase options were exercised, when compared with the depreciated value with the equipment, is such that it would be economically unrealistic not to finance that remainder. Victoria further asserts that Walker's representative knew Victoria's intent was to purchase the equipment and that such intent is further evidenced by Victoria's accounting of the transactions on its books as capitalized purchases of equipment. Finally, Victoria challenges any characterization of Caterpillar's IMAP program, in which Walker participated, as other than a financing device.

In response Walker contends that it never agreed to sell Victoria the equipment and, in fact, refused to finance any purchases for Victoria. Walker further asserts that the same purchase order form was used for most or all of its transactions with customers and the duties placed upon Victoria by the lease agreements are normal and consistent in rentals of commercial equipment. Walker further maintains that the rental payments it received are equal only to depreciation of the equipment plus approximately 20% profit for its risk. Therefore, according to Walker, the remaining price which must be paid if the purchase options were exercised, is not such that Victoria is economically compelled to purchase the equipment. Walker argues the IMAP program is irrelevant to these transactions as none of the equipment leased to Victoria served to delay Walker's remittances to Caterpillar because the equipment came from existing inventory. Finally, Walker indicates that Victoria's initial contact with it was for leasing only, although possible conversion to purchase was discussed at a later time. Walker's books showed Victoria's payments only as rental income.

■ The Bankruptcy Code, while it provides for the assumption and rejection of a lease, does not define the term "lease." Section 101(45) of Title 11, United States Code defines a "security interest" as a lien created by an agreement. The legislative history of this section indicates that state or local law should be applied in determining whether a lease constitutes a security interest under the Bankruptcy Code. H.R.

No. 95–595, 95th Cong., 1st Sess. at 314 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6271.

Relevant state law is not specified in the agreements between Walker and Victoria. Whether Ohio or West Virginia law controls, the statutory language is the same and the tests set forth by case law in both states are similar. The relevant statutory language is as follows:

> Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

W.Va.Code § 46–1–201(37) (Michie Supp. 1988); Ohio Rev.Code § 1301.01(KK) (Anderson Supp.1987).

Although various lists of facts have been set forth by different courts, this Court agrees with the opinion in *Sight and Sound of Ohio, Inc. v. Wright (In re Wright)*, that:

> The appropriate course to follow is to analyze all the relevant factors surrounding the lease agreement and relationships created therein, in determining if the parties in fact intended to create a security interest. The court finds this approach preferable to adoption of a rigid test or set of criteria because of the fact sensitive nature of the inquiry and the need for a flexible analytical framework that enables the court to analyze the totality of the facts presented.

36 B.R. 885, 890 (S.D.Ohio 1983).

■ The statute requires the Court to discuss the intent of the parties at the time the agreement was entered into. That issue is primarily factual. *In re Puckett*, 60 B.R. 223, 235 (Bankr.M.D.Tenn.1986), *aff'd.*, 838 F.2d 470 (6th Cir.1988). The intent is to be objectively determined from the facts of the particular case. *Leasing Service Corp. v. Eastern Equipment Co.*

*(In re Eastern Equipment Co.)*, 11 B.R. 732, 736 (Bankr.S.D.W.Va.1981), *vacated on other grounds*, 27 B.R. 980 (S.D.W.Va. 1983). If such intent is not clear from testimony of the factual circumstances surrounding the transactions, documentary evidence, or the parties' subsequent treatment of the relationship, such intent can be inferred or presumed from an evaluation of the "lessee's" rights at the end of the lease term. Analysis of that important factor considers whether the "lessee" is compelled, either under the terms of the lease or by economic practicality, to accept and pay for the property, or whether the lessee may just as plausibly return it to the lessor. *Jahn v. M.W. Kellogg Co., Inc. (In re Celeryvale Transport, Inc.)*, 822 F.2d 16 (6th Cir.1987); *Alzfan v. Bowers*, 175 Ohio St. 349, 194 N.E.2d 852 (1963).

■ In this matter the Court finds that the intent of the parties at the onset of the transactions was to create a lease for the initial term with a purchase option which might be exercised after six months. Testimony clearly established that Victoria was under no compulsion or duty to purchase the machinery. Further, the price to be paid if the purchase option were exercised, while somewhat less than the depreciated fair market value of the equipment at that time, is not so disparate that Victoria was "economically compelled" to invoke the purchase option. *Celeryvale Transport*, 822 F.2d at 18. In addition, the term of the lease is reasonably short when compared to the useful life of the equipment. Some "equity" existed in favor of Victoria at the end of the lease period because the depreciated value of the equipment was approximately 10% higher than the price remaining to be paid. That degree of difference, without the presence of other significant facts, however, does not establish economic compulsion. Although the IMAP program meant that Walker could offer Victoria an incentive to purchase the equipment by the subsidized interest rate given through the initial rentals, it is clear that at least two of these transactions did not directly benefit Walker under the IMAP program except perhaps to add to the base

inventory. The evidence is not sufficiently strong for this Court to find either that the parties intended from the onset that these transactions would be sales or that Victoria had no feasible or sensible economic option other than to purchase the equipment at the end of the six-month term. Without stronger evidence, the transactions will not be recharacterized in a manner which differs from that established by the documentation.

The Court believes Victoria needed equipment for a job in West Virginia and hoped to convert the rentals to purchases if the equipment were still needed at the end of the rental term and Victoria had the means to exercise those purchase options. On balance, the facts surrounding the transactions with Walker do not establish that the parties intended to enter into sales transactions from the outset or that the substance of the transactions were sales with retained security interests.

Based on the foregoing, the Court determines that the agreements between Victoria and Walker relating to Orders # 1, # 2, and # 3 are true leases.

### B. Automatic Conversion to Financing Arrangements

Victoria also asks, if the transactions are determined to be true leases, that the Court find that such leases automatically converted to financing arrangements at the end of the corresponding rental periods. However, the evidence did not establish that such automatic conversions occurred or that Victoria could have forced such conversions.

Uncontroverted testimony from Walker's credit manager established that Walker considered Victoria's expressed interest in converting Leases # 1, # 2, and # 3 into purchase agreements. Walker then determined that it would not finance such purchases. That decision resulted from Walker's inability to get a clear title to the equipment proposed as a trade-in by Victoria and Walker's evaluation of Victoria's marginal credit rating. Having made that determination, Walker had no further obligation to Victoria relating to the equipment except to accept the full remaining purchase prices, if tendered, or perhaps, to renew the lease terms at higher rates. No tender of the purchase price has been made.

### C. Assumption or Rejection of the Leases by Victoria

Walker seeks an order from this Court forcing Victoria to decide immediately whether it should assume or reject the leases of equipment owned by Walker. On the other hand, Victoria desires to postpone its decision until the time of confirmation of any proposed plan of reorganization.

The Court notes that Victoria's Chapter 11 case was filed on April 27, 1988. Accordingly, Victoria has had approximately six months to determine its need for Walker's equipment and to evaluate its ability to cure any defaults in payments to Walker and provide adequate assurance of future performance. Other than insurance coverage ordered by the Court, the Court is not aware that any adequate protection payments have been made or offered to Walker.

The Court finds that the type of personal property involved in these leases, the possibility that some of the leases are no longer existent, and the length of time which has passed without compensation to Walker for the depreciation of its equipment require that Victoria decide, within forty-five (45) days of the entry of this order, whether it will assume or reject each of its three leases with Walker. Absent some other resolution agreed to by the parties, such determination must be made formally within that time.

IT IS SO ORDERED.