DECISION AND JUDGMENT ENTRY
{¶ 1} Keith E. Vorhees, Sr., on behalf of: himself; his son, Keith E. Vorhees, Jr.; his deceased wife, Lora Ann Vorhees; and his deceased children, Vanessa and Jarred Vorhees, appeals the Athens County Court of Common Pleas' decisions granting summary judgment to James V. Jovingo, Strawn Plumbing Company, and Columbia Gas of Ohio, Inc. The Vorhees contend that the trial court erred in ruling that no genuine issues of material fact exist and that each defendant is entitled to judgment as a matter of law. Because we find, when construing the evidence in the light most favorable to the Vorhees, that genuine issues of material fact remain and that reasonable minds could reach different conclusions with regard to defendants Jovingo and Strawn, we agree as to those defendants. With regard to Columbia Gas, however, we find that no genuine issue of material fact remains and that Columbia Gas is entitled to judgment as a matter of law. The Vorhees also contend that the trial court abridged their constitutional rights to a jury trial and to justice by granting summary judgment to the defendants. Our reversal of the trial court's summary judgment determinations regarding Jovingo and Strawn renders these arguments moot with respect to those defendants. With respect to Columbia, because summary judgment is a well-established and just procedure for resolving cases in which no genuine issue of material fact is disputed, we disagree. Accordingly, we affirm in part and reverse in part the judgment of the trial court.
 I. {¶ 2} Jovingo purchased the residence at 135 Lyle Avenue in Nelsonville, Ohio for the express purpose of selling it to Mrs. Vorhees. In April of 1999, the previous owner vacated the property and Jovingo took possession. Sometime before Jovingo took possession, Columbia Gas turned off the gas service to the property.
 {¶ 3} Before selling the house to Mrs. Vorhees, Jovingo went under the house in the crawl space to check some of the gas pipes. He found a loose connection under the living room. The next day, Jovingo went back under the house to tighten the pipes and install a union. He did not touch any pipes under the kitchen or laundry room area from underneath the house. Inside the house, Jovingo installed a shutoff valve where the gas line for the clothes dryer comes through the laundry room floor.
 {¶ 4} Jovingo and Mrs. Vorhees entered into a written agreement entitled "Land Contract." Jovingo contends that the land contract was an agreement to sell the property to Mrs. Vorhees "as is," while the Vorhees contend that the contract was a lease agreement with an option to purchase.
 {¶ 5} When Jovingo and Mrs. Vorhees signed the land contract, Columbia Gas had not restored gas service to the property. Jovingo and Mrs. Vorhees agreed that Jovingo would make sure the gas was turned on and operable. Jovingo called Columbia Gas to have the service restored. Columbia Gas informed Jovingo that the house was "red tagged," and that they would not restore service until a certified plumber checked the system and repaired any leaks.
 {¶ 6} During the first week of June 1999, Jovingo hired Strawn Plumbing Company. Two plumbers from Strawn attached a Kuhlman gauge to the gas line on the house side of the gas meter. The Kuhlman gauge showed that the gas line was leaking. The Strawn employees looked for the leak by checking the pipefittings in the crawl space between where the gas line rose from the ground and connected to the furnace. They located a leak near the furnace and fixed it by replacing a section of pipe. After fixing the leak, they again attached the Kuhlman gauge. This time, the Kuhlman gauge held pressure, indicating that there were no leaks.
 {¶ 7} Strawn notified Columbia Gas that they repaired the gas leak at the house. Columbia Gas, in turn, sent an employee to the house to turn on the gas. The Columbia Gas employee, in the presence of the two Strawn employees, tested the gas line using a Kuhlman gauge. The line held pressure for more than five minutes. As a result, Columbia Gas restored service to the house.
 {¶ 8} For unknown reasons, Columbia Gas shut off the gas service to the house again. On October 29, 1999, a Columbia Gas employee went to the property in response to a turn on order. He applied a Kuhlman gauge to the gas line, determined that there were no leaks, and turned on the gas.
 {¶ 9} Mr. and Mrs. Vorhees were divorced at the time Mrs. Vorhees entered into the contract with Jovingo. However, shortly after Mrs. Vorhees signed the land contract and moved into the house with the children, she and Mr. Vorhees reconciled and remarried. Mr. Vorhees moved into the house with Mrs. Vorhees and the children.
 {¶ 10} On November 24, 1999, Mr. Vorhees rented a clothes dryer from Ace Rental. Mr. Vorhees personally installed the dryer in the laundry room. He claims he used a metal hose, though some of the experts who examined the scene later surmised that he used a rubber hose. He attached the gas line to the dryer, then turned on the gas, checked the connections with soapsuds, and found no leaks.
 {¶ 11} The Vorhees family used the dryer every day or every other day from November 25, 1999 until December 22, 1999. Mr. Vorhees never smelled a natural gas odor anywhere in the house, including in the laundry room. On December 21, 1999, Mr. Vorhees put clothing in the washing machine before going to bed. Mrs. Vorhees came home around 2:00 a.m. on December 22, 1999. Mr. Vorhees awoke and asked Mrs. Vorhees to put his clothes in the dryer before coming to bed. Mrs. Vorhees said that she would, and Mr. Vorhees went back to bed.
 {¶ 12} Mr. Vorhees awoke later and found the house burning. Mrs. Vorhees initially escaped to the porch, but apparently reentered the house to save her children. Mr. Vorhees and Keith Jr. escaped. Mrs. Vorhees, Vanessa, and Jarred perished in the fire.
 {¶ 13} Several fire experts, including investigators from the Ohio State Fire Marshall's office and from Jovingo's insurer, investigated the scene after the fire. While the experts agree that the fire began in the laundry room area, their collective opinions are inconclusive as to what ignited the fire. Some of the experts opine that operation of the gas dryer ignited the fire, while others believe that the pilot light on the hot water heater served as the ignition source. The experts agree that the fire was fueled primarily by gas below the floor. However, they do not agree as to whether the gas escaped due to cracks in the gas line, loose fittings, or some other reason.
 {¶ 14} Mr. Vorhees, on behalf of himself, his surviving son, and his deceased wife and children (collectively "the Vorhees"), sued Jovingo, Strawn, and Columbia Gas, alleging that the negligence of each was the proximate cause of the fire. Each defendant moved for summary judgment. The defendants alleged, in part, that Mr. Vorhees' improper installation of the dryer caused the fire.
 {¶ 15} The Vorhees supported their memoranda in opposition with the affidavit of their expert, Michael S. Linscott. Linscott opined, to a reasonable degree of professional certainty, that the fugitive natural gas that fueled the fire came from a crack in the natural gas line below the laundry room floor. Linscott further opined that the initial crack in the line was the result of the stresses created by the movement of the line. Linscott believed that Jovingo and Strawn's cutting, threading, tightening, and replacement of pipe created the movement that precipitated the crack. Thus, Linscott concluded that "[t]he cause of this fire was the actions of Mr. Jovingo and Strawn during their activities to repair leaks in the house piping system, and their failure to fully inspect a piping system that both knew had displayed multiple leaks and was aged."
 {¶ 16} Further, Linscott noted that any time pipes can move freely, a dangerous condition arises, and a qualified plumber should recognize the significant danger associated with a pipe's free movement. The parties do not dispute that only one makeshift support held over twenty-five feet of pipe at 135 Lyle Avenue, when the National Fire Protection Association ("NFPA") guidelines require one support for every eight feet. Linscott opined that the fact that the pipes at the house moved freely "would have been apparent to anyone working on the pipes to repair leaks and, certainly, while cutting, threading, replacing, and tightening pipes." Thus, Linscott concluded that Jovingo and Strawn should have noticed the dangerous condition when they worked on the pipes.
 {¶ 17} The trial court granted summary judgment in favor of Jovingo, Strawn, and Columbia Gas in three separate decisions, and the Vorhees appeal. With respect to each defendant, the Vorhees advance four assignments of error that are identical except for the party named. We consolidated the three appeals for purposes of judicial economy.
 {¶ 18} In their assignments of error, the Vorhees assert: "I. The trial court erred to the prejudice of appellants Keith E. Vorhees Sr. et. al., in granting summary judgment in favor of [each defendant] and in dismissing their claim against [each defendant] since [each defendant] was not entitled to summary judgment under Civil Rule 56 because genuine issues of material fact were presented for determination by the jury. II. The trial court erred to the prejudice of appellants Keith E. Vorhees Sr., et. al., in granting summary judgment in favor of [each defendant] and in dismissing their claim against [each defendant] since [each defendant] was not entitled to judgment as a matter of law. III. The trial court's action in granting [each defendant's] motion for summary judgment abridged the appellants' constitutional right to a jury trial guaranteed by Article I, Section 5 of the Ohio Constitution and theSeventh Amendment to the U.S. Constitution. IV. The trial court's action in granting [each defendant's] motion for summary judgment abridged the appellants' constitutional right to a remedy and to justice guaranteed by Article I, Section 16 of the Ohio Constitution."
 II. {¶ 19} Summary judgment is appropriate only when it has been established:
(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to only one conclusion, and that conclusion is adverse to the nonmoving party. Civ.R. 56(A). See Bostic v. Connor
(1988), 37 Ohio St.3d 144, 146; Morehead v. Conley (1991),75 Ohio App.3d 409, 411. In ruling on a motion for summary judgment, the court must construe the record and all inferences therefrom in the opposing party's favor. Doe v. First United Methodist Church (1994),68 Ohio St.3d 531, 535.
 {¶ 20} The burden of showing that no genuine issue of material fact exists falls upon the party who moves for summary judgment. Dresher v.Burt (1996), 75 Ohio St.3d 280, 294, citing Mitseff v. Wheeler (1988),38 Ohio St.3d 112, 115. However, once the movant supports his or her motion with appropriate evidentiary materials, the nonmoving party "may not rest upon mere allegations or denials of his pleadings, but his response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E); Wing v. Anchor Media, Ltd. of Texas (1991),59 Ohio St.3d 108, 111; Dresher, supra at 294-95.
 {¶ 21} In reviewing whether an entry of summary judgment is appropriate, an appellate court must independently review the record and the inferences that can be drawn from it to determine if the opposing party can possibly prevail. Morehead, 75 Ohio App.3d at 411-12. "Accordingly, we afford no deference to the trial court's decision in answering that legal question." Id. See, also, Schwartz v. Bank-One,Portsmouth, N.A. (1992), 84 Ohio App.3d 806, 809.
 III. {¶ 22} In their first two assignments of error against Jovingo, the Vorhees assert that the trial court erred in granting summary judgment to Jovingo because genuine issues of material fact remain and Jovingo is not entitled to judgment as a matter of law. First and foremost, the Vorhees contend that a genuine issue of material fact exists with respect to whether Jovingo held the status of landlord or vendor in his relationship with Mrs. Vorhees. Jovingo contends that the "Land Contract" he and Mrs. Vorhees signed constitutes a land installment contract under which he was a vendor and owed no duty regarding the condition of the property. The Vorhees contend that the agreement constitutes a lease, under which Jovingo owed Mrs. Vorhees a duty regarding the condition of the property. Jovingo counters that even if he was a landlord to Mrs. Vorhees, he still did not breach his duty of care to her.
 A. {¶ 23} A court must interpret a contract so as to carry out the intent of the parties. Foster Wheeler Enviresponse, Inc. v. Franklin Co.Convention Facilities Auth. (1997), 78 Ohio St.3d 353; Skivolocki v. EastOhio Gas Co. (1974), 38 Ohio St.2d 244, paragraph one of the syllabus. "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement." Shifrin v. Forest CityEnts., Inc. (1992), 64 Ohio St.3d 635; Kelly v. Med. Life Ins. Co.
(1987), 31 Ohio St.3d 130, paragraph one of the syllabus. If a contract is clear and unambiguous, then its interpretation is a matter of law that we review de novo. Nationwide Mut. Fire. Ins. Co. v. Guman Bros. Farm
(1995), 73 Ohio St.3d 107, 108. However, if the contract is ambiguous, ascertaining the parties' intent constitutes a question of fact. CraneHollow, Inc. v. Marathon Ashland Pipeline, LLC (2000),138 Ohio App.3d 57, 74.
 {¶ 24} To determine whether a written agreement is a lease or a purchase agreement, the court should analyze the intent of the parties as evidenced in the written agreement. Fadelsak v. Hagley, Lawrence App. No. 02CA41, 2003-Ohio-3413, at ¶ 10, citing Hubbard v. Dillingham,
Butler App. No. CA2002-02-045, 2003-Ohio-1443, at ¶ 11; In re D.W.E.Screws Products, Inc. (Bkrtcy.S.D.Ohio 1993), 157 B.R. 326, citing In reVictoria Hardwood Lumber Co., Inc. (Bkrtcy.S.D.Ohio1988), 95 B.R. 954. In determining intent, the court should consider factors such as: (1) the characterization of the document; (2) the lessee's rights at the end of the lease term; (3) the application of rent to the purchase price; (4) the responsibility for payments for repairs, utilities, and taxes; (5) the nonexistence of a financing statement; and (6) whether an option to purchase existed. Fadelsak at ¶ 10. If necessary, the court may also consider the factual circumstances surrounding the parties' agreement. Id.
 {¶ 25} Ohio courts define a "lease" as "a conveyance of an estate in real property for a limited term, with conditions attached, in consideration of rent." Cuyahoga Metro. Hous. Auth. v. Watkins (1984),23 Ohio App.3d 20, 23, quoting Jones v. Keck (1946),79 Ohio App. 549, 552. A "land installment contract" is "an executory agreement which by its terms is not required to be fully performed by one or more of the parties to the agreement within one year of the date of the agreement and under which the vendor agrees to convey title in real property located in this state to the vendee and the vendee agrees to pay the purchase price in installment payments, while the vendor retains title to the property as security for the vendee's obligation. Option contracts for the purchase of real property are not land installment contracts." R.C. 5313.01; Fadelsak at ¶ 11. An option contract "consists of two independent elements: (1) an offer to buy, sell, or perform some act, which becomes a contract if properly accepted; and (2) the binding agreement to leave the offer open for a specified period of time."Central Funding, Inc. v. CompuServe Interactive Services, Inc., Franklin App. No. 02AP9-72, 2003-Ohio-5037, at ¶ 38, citing Aldahan v. TanskySales, Inc. (June 20, 2000), Franklin App. No. 99AP-651; Stuller v.Levering (Aug. 23, 1996), Knox App. No. 95-CA-26.
 {¶ 26} In Fadelsak, the agreement in dispute was captioned "Lease with Option to Purchase." However, we determined that the agreement was actually a land installment contract. We based our determination on the fact that the agreement applied all rent paid to purchase price, obligated the tenants to make rent payments for 20 years, implied that the tenants would gain ownership of the property upon the end of the lease term, and treated the tenants like property owners. Additionally, we found that the circumstances surrounding the agreement indicated that the parties intended a purchase agreement.
 {¶ 27} Here, the agreement between Jovingo and Mrs. Vorhees is entitled "Land Contract." The contract provides, in part:
"* * * the seller agrees to sell, and the buyer agrees to buy, in accordance with the term and conditions of this agreement, the following property. Street address known as: 135 Lyle Ave. Purchase price of: $48,500.00. * * *
1) Buyer agrees to pay seller $330.00 per month. Each payment is due on the First of each month, in advance, beginning 4/15/99 and ending 4/15/00. * * * Down payment received: Sweat Equity credit after work is complete and approved by seller ($3,500.00). * * *
2) At the end of the term of this agreement, Buyer agrees to purchase the property at a sale price of $48,500.00. If buyer fails to purchase the property, within the specified time, then buyer agrees that the amounts credited toward purchase will be forfeited to Seller as liquidated damages. * * * Such purchase is to be completed on the part of the buyer within the term of this contract or within thirty (30) days thereafter, unless option to renew this agreement has been exercised."
 {¶ 28} Jovingo testified in his deposition that he intended that the agreement be a land installment contract. However, the written agreement does not clearly support his stated intent. Specifically, unlike the contract at issue in Fadelsek, the agreement here does not clearly apply all rent paid to the purchase price. Instead, the agreement lists the purchase price of the property as $48,500, requires Mrs. Vorhees to pay $330 per month for one year, and states that at the end of one year, Mrs. Vorhees may purchase the property for $48,500. While the agreement references "amounts credited toward purchase," this phrase does not clearly refer to the monthly payments. Additionally, unlike the twenty-year agreement in Fadelsak, the agreement here is valid only for a term of one year. The contract requires Mrs. Vorhees to complete her purchase of the property within one year and thirty days. In this way, the contract appears to be an option contract combined with a lease agreement. As we noted above, R.C. 5313.01 explicitly provides, "[o]ption contracts for the purchase of real property are not land installment contracts." Based upon these factors, we find that a genuine issue of fact exists with regard to the legal status of Jovingo and Mrs. Vorhees.
 B. {¶ 29} The proper characterization of the legal relationship between Jovingo and Mrs. Vorhees is material only if reasonable minds could conclude that Jovingo breached the higher duty of care imposed upon landlords. The trial court ruled that even if Jovingo held the status of landlord, and thus owed a duty to Mrs. Vorhees, Jovingo nonetheless did not breach his duty to Mrs. Vorhees.
 {¶ 30} The law determines when a landlord owes a duty to a tenant. Under common law, a landlord cannot be held liable unless the defect existed when the tenant took control of the premises. Shindelbeck v.Moon (1877), 32 Ohio St. 264; Burnworth v. Harper (1996),109 Ohio App.3d 401, 407. Similarly, a landlord commits negligence per se if he fails to properly maintain all electrical, plumbing, sanitary, heating, ventilating, and air conditioning systems supplied by him. R.C. 5321.04(A)(4); Sikora v. Wenzel, 88 Ohio St.3d 493,2000-Ohio-406, syllabus; Shroades v. Rental Homes (1981), 68 Ohio St.2d 20. However, "a landlord will be excused from liability * * * if he neither knew nor should have known of the factual circumstances that caused the violation." Sikora at syllabus. "[G]eneral knowledge of the possibility of a defect does not rise to the level of either actual or constructive notice." Burnworth at 406.
 {¶ 31} In Burnworth, a tenant died of carbon monoxide poisoning when she operated a heater with a clogged flue. The landlord admitted that he never inspected the heating or ventilation system in the apartment and did not have any regular maintenance schedule for the system. However, he presented evidence that the gas company inspected the system one year prior to the incident and did not find any problems with the flue. The tenant offered no evidence to show that the landlord would have found the clogged flue if he had inspected the system. And, the tenant offered no evidence of when the flue became clogged or that the landlord could have prevented the clog. Thus, we found that the landlord had no notice of the defect, and we sustained the trial court's entry of summary judgment in favor of the landlord. Burnworth at 407.
 {¶ 32} In his motion for summary judgment, Jovingo identified evidence, specifically his own testimony, to support his contention that he had no knowledge that there was a gas leak at the house after Strawn made repairs in June of 1999. Jovingo bolstered the credibility of his testimony that he had no knowledge of the dangerous condition by filing evidence that Strawn and Columbia Gas both tested the line and found no leaks. Jovingo contends that he, like the landlord in Burnworth,
reasonably relied upon the gas company's assessment of the system's safety and had no knowledge of any defect with the gas line. Additionally, Jovingo argues that he had no knowledge because the Vorhees never notified him that they smelled gas or suspected a gas leak.
 {¶ 33} Once Jovingo presented evidence that he had no knowledge regarding the gas leak that fueled the fire, the burden shifted to the Vorhees to point to evidence in the record raising a genuine issue of material fact regarding Jovingo's knowledge. The Vorhees offered evidence that Jovingo knew, or should have known, about the cracked gas line under the laundry room floor. First, unlike the Burnworth tenant, the Vorhees offered evidence that the crack in the gas line was present when the Vorhees moved into the home. In fact, the Vorhees offered evidence that Jovingo himself caused the crack when he installed the union, by causing significant movement and stress to the line during the installation. Specifically, the Vorhees offered Linscott's expert testimony that the dangerous condition should have been apparent to Jovingo when he tightened the pipes and installed the union, because the pipes were not properly secured and could move freely. Also unlike the Burnworth tenant, the Vorhees presented evidence that Jovingo would have noticed the defect with the gas line and could have prevented the leak had he inspected the line. Specifically, the Vorhees' expert described the deficiencies with the gas line as "apparent" and "noticeable."
 {¶ 34} While the Vorhees' evidence is undermined by the fact that Strawn and Columbia tested the gas line and found that it held pressure, this apparent conflict in the evidence gives rise to a genuine issue of material fact. A visual inspection of the line may have revealed a defect, such as a crack in the line that had not yet breached the pipe or a point where the line was sagging and under stress. Additionally, if Jovingo possessed the necessary expertise to install the union, he may have understood the significance of the movement of the gas line during installation. It is for a jury to determine whether Jovingo reasonably relied upon the leak test, or instead should have known about the defect in the line.
Because we find that a genuine issue of material fact exists with regard to whether Jovingo breached his duty as a landlord to the Vorhees, we sustain the Vorhees' first two assignments of error with regard to Jovingo.
 IV. {¶ 35} In their first and second assignments of error against Strawn, the Vorhees contend that the trial court erred in granting summary judgment because genuine issues of material fact remain in dispute and Strawn is not entitled to judgment as a matter of law. Strawn contends that the trial court correctly ruled that its sole responsibility was to repair the gas leak and that it did so in accordance with accepted industry practices.
 {¶ 36} Strawn asserts that the record contains undisputed evidence that it followed generally accepted practices in testing for, finding, and repairing the gas leak that was preventing service from being restored to 135 Lyle Avenue in June of 1999. Specifically, Strawn points to the evidence that it tested the line once and that Columbia Gas tested the line twice, and none of the three tests revealed a leak. Strawn contends that the Vorhees failed to point to any evidence that would suggest that Strawn did not properly repair the existing leak. Additionally, while Strawn concedes that the gas line was not supported with a sufficient number of hangers pursuant to NFPA guidelines, Strawn argues it was hired solely to repair the existing leak, and that the NFPA guidelines apply to the installation of gas lines, not their repair. Finally, Strawn asserts that because Columbia Gas tested the gas line and turned on the gas following the repair they performed, Columbia Gas' intervening acts sever any proximate cause link between their work and the fire.
 {¶ 37} Contrary to Strawn's assertion, the Vorhees presented evidence that Strawn did not perform the repair of the gas leak in accordance with industry standards. Although the gas line held pressure immediately after the repairs, this fact does not eliminate the possibility that Strawn did not perform the repair in a workmanlike manner. The Vorhees' expert, Linscott, averred that when cutting, threading, tightening, and replacing a section of the pipe, Strawn's plumbers caused significant movement of the pipe. This movement occurred because the pipe was not adequately supported. Linscott opined that the movement would have been apparent to anyone working on the pipes to repair leaks. Additionally, Linscott opined that qualified plumbers should understand that movement of pipes often creates a dangerous condition.
 {¶ 38} Linscott further averred that, when Strawn's plumbers moved the pipes at 135 Lyle Avenue, they created a dangerous condition by causing or worsening a crack in the gas line. Thus, Linscott concluded not only that the Strawn plumbers should have noticed the unsafe movement of the pipes during its repair activities, but also that the Strawn's plumbers aggravated or even caused the crack in the pipes during their repair activities. While Strawn, in its role as a repairer instead of an installer, may not have been required to notice the insufficient number of hangers supporting the pipes, Linscott's opinion nonetheless supports a finding that Strawn's plumbers should have noticed and understood the danger arising from the movement of the pipe during its repair activities. We find that this constitutes some evidence upon which reasonable minds could conclude that Strawn breached its duty to properly repair the gas line.
 {¶ 39} Strawn argues that it is entitled to summary judgment even if it breached a duty to the Vorhees, because Columbia Gas' intervening acts prevent a finding that Strawn proximately caused the fire. Specifically, Columbia Gas twice tested the line with a Kuhlman gauge and restored gas service to the house. An intervening act will not prevent liability for negligence if the intervening act was reasonably foreseeable by the negligent party. Cascone v. Herb Kay Co. (1983), 6 Ohio St.3d 155, paragraph one of the syllabus. Here, Strawn could reasonably foresee that Columbia Gas would test to see if the line held pressure and restore service. In fact, after Strawn's employees replaced a section of pipe and tested it with their Kuhlman gauge, they called Columbia Gas for the purpose of getting Columbia Gas to test the line and restore service to the home.
 {¶ 40} Because the record contains some evidence upon which reasonable minds could conclude that Strawn negligently repaired the gas leak at the Vorhees' home and proximately caused the fire, we find that a genuine issue of material fact remains and that Strawn is not entitled to judgment as a matter of law. Accordingly, we sustain the Vorhees' first and second assignments of error with respect to the trial court's judgment in favor of Strawn.
 V. {¶ 41} In their first and second assignments of error against Columbia Gas, the Vorhees contend that the trial court erred in granting summary judgment to Columbia Gas because genuine issues of material fact remain in dispute and Columbia Gas is not entitled to judgment as a matter of law. In particular, the Vorhees contend that Columbia Gas had knowledge of a probable defective condition in the gas pipes at the house, and thus had a common law duty to inspect the pipes. Additionally, the Vorhees contend that Columbia Gas' Tariff imposed a duty on Columbia Gas to inspect the gas pipes at the house. Because Columbia Gas merely tested, but did not inspect, the gas pipes at the house, the Vorhees contend that Columbia Gas breached its duty. The Vorhees further argue that Columbia Gas would have noticed the absence of a sufficient number of hangers supporting the gas line if it inspected the pipes. Thus, the Vorhees contend that Columbia Gas proximately caused their injuries.
 A. {¶ 42} Under Ohio common law, a gas company has no duty to inspect, maintain, or repair gas pipes or appliances owned by a customer or property owner. Perry v. East Ohio Gas Co. (1960), 82 Ohio Law Abs. 584, 590; Hanlon v. Lane (1994), 98 Ohio App.3d 148, 151-52. "The rule as to the legal duty of the gas company in reference to the escape of gas from service pipes owned and controlled by others on private property, which pipes have been properly installed and tested, does not extend to thereafter making inspection, unless the gas company has knowledge of a probable defective condition in such pipes, or has knowledge of circumstances rendering it probable that gas is escaping therefrom."Wilson v. East Gas Co. (1942), 68 Ohio App. 490, 500.
 {¶ 43} Here, Columbia Gas supported its motion for summary judgment with evidence that it did not have knowledge of a probable defective condition in the gas pipes at the Vorhees' residence. Specifically, Columbia Gas points to the fact that it tested the line at the Vorhees' residence and found that the line held pressure.
 {¶ 44} The Vorhees allege that the record contains evidence from which reasonable minds could conclude that Columbia Gas had knowledge of a probable defective condition of the gas pipes at their home. Specifically, the Vorhees note that Columbia Gas admittedly visited the property at 135 Lyle Avenue on 13 different occasions in a two and one-half year period. However, the Vorhees did not present any evidence of how many visits related to a gas leak and how many were for another purpose, such as routine maintenance or establishing service for a new tenant. Even when construing the evidence in a light most favorable to the Vorhees, we cannot find that the number of visits, by itself, leads to a reasonable inference that Columbia Gas had knowledge of a probable defective condition in the pipes. Therefore, the Vorhees failed to meet their burden of presenting evidence upon which reasonable minds could conclude that Columbia Gas had a common law duty to inspect the pipes.
 B. {¶ 45} The Vorhees also contend that Columbia Gas' Tariff imposed a duty upon Columbia Gas to inspect Strawn's work. Specifically, the Vorhees quote Paragraph 30 of the Tariff as providing "[I]n the case of leak * * *, necessary correction shall be made at the customer's expense and then the lines will be inspected and tested again by the Company." (Emphasis added.) In its entirety, Paragraph 30 of the Tariff provides:
"Standards for Customer's Property. The customer's service line, house lines, fittings, valve connections and appliance venting shall be installed with materials and workmanship which meet the reasonable requirements of the Company and shall be subject to inspection or test by the Company. The Company shall have no obligation to establish service until after such inspection and test demonstrates compliance with such requirements of the Company with respect to the facilities in place at the time of the test.
The first inspection or test at any premises, including both service lines and house lines, shall be without charge. In the case of leak, error, patent defect or other unsatisfactory condition resulting in the disapproval of the line by the Company, the necessary correction shall be made at the customer's expense and then the lines will be inspected and tested again by the Company. Each additional inspection and test, when required after correction, shall be subject to a charge covering the cost thereof."
 {¶ 46} A tariff filed in accordance with the law has the force and effect of a statute. See Anthony Carlin Co. v. Hines (1923),107 Ohio St. 328, syllabus; Carter v. ATT (C.A.5, 1966), 365 F.2d 486,496. Words and phrases in a statute shall be read in context, and effect must be given to the entire statute. R.C. 1.42; State ex rel. Moss v.Ohio State Hwy. Patrol Retirement Sys., 97 Ohio St.3d 198, 2002-Ohio-5806, at ¶ 20. We find that the Vorhees' reliance upon an isolated quotation from Paragraph 30 is misplaced. When read in its entirety, Paragraph 30 applies only to the initial establishment of services at any premises. Numerous other provisions in the Tariff support this interpretation and absolve Columbia Gas from responsibility for inspecting the customer's line after the initial establishment of service. For example, Paragraph 9 of the Tariff provides that the "[c]ustomer assumes all responsibility for property owned by the customer on the customer's side of the point of delivery." Paragraph 28 of the Tariff provides that Columbia Gas "shall have no obligation to install, maintain or repair said [house] piping." And Paragraph 32 of the Tariff provides that Columbia Gas "is not responsible for maintenance of, or any imperfect material or defective or faulty workmanship in, the customer's service line, house lines, fittings, valve connections, equipment or appliances and is not responsible for any loss or damage arising from inadequate or improper maintenance or from imperfect material or defective or faulty workmanship."
 {¶ 47} Because we find that no genuine issue of material fact exists and that Columbia Gas had no duty to inspect the Vorhees' gas line under either the common law or the Tariff, we find that Columbia Gas is entitled to judgment as a matter of law. Accordingly, we overrule the Vorhees' first and second assignments of error with respect to Columbia Gas.
 VI. {¶ 48} In their third and fourth assignments of error against each of the defendants, the Vorhees contend that the trial court abridged their constitutional rights to a jury trial and to justice by granting summary judgment to the defendants. Our reversal of the trial court's summary judgment determinations regarding Jovingo and Strawn renders the Vorhees' arguments moot with respect to these defendants. However, because we find that no genuine issues of material fact exist with regard to Columbia Gas and that Columbia Gas is entitled to judgment as a matter of law, we address the constitutional arguments presented by the Vorhees.
 {¶ 49} As Columbia Gas notes, this court rejected identical arguments in Goodin v. Columbia Gas of Ohio (2000), 141 Ohio App. 3d 207. InGoodin, we held:
"Summary judgment is an accepted procedure for resolving cases in which no material facts remain disputed. The Rules of Civil Procedure expressly authorize the summary judgment procedure, and the Ohio Supreme Court consistently has sanctioned the procedure. The rule helps to promote judicial economy by `unclogging [from] courts' dockets * * * lawsuits which do not present substantial questions for determination at trial.' We discern no reason why this court should disregard an accepted procedure for judicious resolution of cases and conclude that summary judgment violates a litigant's right to a remedy or to a jury trial. Such a result clearly would be contrary to the well-established principles of summary judgment procedure."
 {¶ 50} The only distinction the Vorhees draw between their case andGoodin is that here "a mother and her two young children were burned alive * * *." While the tragic results of this fire are apparent, they in no way support a departure from well-established summary judgment law. Thus, as in Goodin, here we decline to depart from the Civil Rules' sound procedure for disposing of cases in which no material facts are disputed and one party is entitled to judgment as a matter of law. Accordingly, we overrule the third and fourth assignments of error that the Vorhees assert against Columbia Gas.
 VII. {¶ 51} In conclusion, we find that genuine issues of material fact exist regarding Jovingo and Strawn's alleged liability for the fire, and that Jovingo and Strawn are not entitled to judgment as a matter of law. Therefore, we sustain the first two assignments of error in the Vorhees' appeals against Jovingo and Strawn. However, we find that no genuine issue of material fact exists regarding Columbia Gas' alleged liability for the fire and that Columbia Gas is entitled to judgment as a matter of law. Accordingly, we overrule the first two assignments of error that the Vorhees assert against Columbia Gas.
 {¶ 52} The third and fourth assignments of error that the Vorhees assert against each defendant are moot as to Jovingo and Strawn. As to Columbia Gas, we find that summary judgment does not abridge a party's constitutional rights to a jury trial or to a just remedy when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Therefore, we overrule the third and fourth assignments of error that the Vorhees assert against Columbia Gas.
 {¶ 53} Accordingly, we reverse the trial court's entry of summary judgment in favor of Jovingo. We reverse the trial court's entry of summary judgment in favor of Strawn. And finally, we affirm the trial court's entry of summary judgment in favor of Columbia Gas.
Judgment affirmed in part, reversed in part and cause remanded.